## UNITED STATES v. MULLENDORE et al.

### SAME v. HUNTER, County Treasurer.

Circuit Court of Appeals, Eighth Circuit.
September 30, 1929.

Nos. 8417, 8439.

C. Kenny Templeton, of Pawhuska, Okl., for appellee Hunter.

Before LEWIS and VAN VALKEN-BURGH, Circuit Judges, and SYMES, District Judge.

LEWIS, Circuit Judge. ■ The question for decision in this suit is, whether Osage homestead allotments inherited by non-competent Osages of half or more Indian blood from a non-competent allottee of like degree of Indian blood are taxable. The suit was brought by appellants in behalf of the heirs. The bill alleges that Fannie Wheeler was an Osage Indian of half or more Indian blood, that she was enrolled as such opposite Roll No. 732; that under the Act of June 28, 1906 (34 Stat. 539), certain lands, describing them, in Osage County, Oklahoma, were allotted to her as a homestead; that on January 27, 1917, she died intestate, without having received a certificate of competency, and left surviving her as her sole and only heirs at law her husband Ben Wheeler and her two children Mary and Francis Wheeler, all of whom are restricted Osage Indians of one-half or more Indian blood and to none of whom has there ever been issued a certificate of competency, that they are the owners in fee simple of said homestead lands, subject only to the supervision of plaintiffs; that said lands were and are inalienable and non-taxable, but nevertheless the sheriff of said Osage County sold said lands in August, 1927, to defendant Mullendore in satisfaction of a claimed lien for taxes assessed thereon for the years 1919 to 1925 both inclusive, and that the sheriff's deed executed pursuant to said sale to Mullendore is now of record in the office of the county clerk of Osage County. A copy of the deed is exhibited with the bill. It is prayed that the deed be adjudged null and void and the title to the lands quieted in said heirs. The board of county commissioners were permitted to intervene as a defendant.

The court below sustained a demurrer to the bill on the ground the facts stated did not entitle plaintiffs to relief. Then this appeal was taken.

In the division of the Osage Indian Reservation in Oklahoma each member of the tribe, as shown by the roll of membership, made three selections of 160 acres each, one of which was designated as a homestead. Osage Allotment Act June 28, 1906, 34 Stat. 539. By paragraph 4 of Section 2 the homestead allotments were made "inalienable and non-taxable until otherwise provided by Act of Congress. The other two selections of each

Louis N. Stivers, Asst. U. S. Atty., of Tulsa, Okl. (John M. Goldesberry, U. S. Atty., of Tulsa, Okl., on the brief), for the United States.

J. H. Maxey, of Tulsa, Okl., and C. Kenny Templeton, of Pawhuska, Okl. (T. J. Leahy and C. S. Macdonald, both of Pawhuska, Okl., on the brief), for appellees Mullendore et al.

member, together with his share of the remaining lands allotted to the member, shall be known as surplus land, and shall be inalienable for twenty-five years, except as hereinafter provided;" but by Paragraph 7 of said Section 2 the surplus lands were to become taxable after the expiration of three years from the date of the approval of the Act. That paragraph also provides that the Secretary of the Interior may, in his discretion, issue to an allottee a certificate of competency which authorizes the allottee to sell and convey any of the lands allotted to him under the Act, except his homestead, which in that case remains inalienable for twenty-five years or during the life of the homestead allottee. Section 6 provides that the allotted lands of any deceased member of the tribe shall descend to the legal heirs of the allottee, and Section 7:

"That the lands herein provided for are set aside for the sole use and benefit of the individual members of the tribe entitled thereto, or to their heirs, as herein provided; and said members, or their heirs, shall have the right to use and to lease said lands for farming, grazing, or any other purpose not otherwise specifically provided for herein, and said members shall have full control of the same, including the proceeds thereof. * * *"

That section also provides that all leases of said lands for the benefit of the members or their heirs shall be subject to the approval of the Secretary of the Interior. The Act also authorizes the principal chief of the tribe to execute deeds to the members for their allotments, but that no deed shall be valid without the approval of the Secretary.

Counsel for appellees concede the homestead is not taxable under the Act of June 28, 1906, and that to sustain the ruling of the district court there must have been subsequent legislation by Congress removing the exemption. In their brief they say:

"If it were not for the Acts of April 18, 1912, and March 3, 1921, there would be no question but what the lands involved would not be subject to taxation, but it is necessary to ascertain the effect of these two Acts for upon their construction the question involved in this case must be determined."

The concession of counsel is in accord with the interpretation given by the Federal courts of the Eighth Circuit to the restrictions in the Act of June 28, 1906. Aaron v. U. S. (C. C. A.) 204 F. 943; U. S. v. Board of Commissioners (C. C.) 193 F. 485, Id. (C. C. A.) 216 F. 883. The Act of April 18, 1912 (37 Stat. 86), contains eleven sections.

Its title shows that it is supplementary to and amendatory of the Act of June 28, 1906, but the body of the Act discloses that only one of its sections (10) is an express amendment to the Act of June 28th, that is Paragraph 4 of Section 4 of the earlier Act, and with that we are not concerned. Section 9 of the Act of April 18th, more out of precaution than of necessity, again defines the word "competent" as meaning a person to whom a certificate has been issued authorizing alienation of all the lands comprising his allotment, except his homestead. Section 11 repeals all acts or parts of acts inconsistent with the Act of April 18th. All other sections of the Act of April 18, 1912, are supplementary to the Act of June 28th, and the two Acts must be read together, retaining all of each in full vigor unless there be parts of the earlier Act in irreconcilable conflict with the later, when the earlier must to that extent give way to the later. There is not to be found in the Act of April 18th an express repeal of the exemption of the homestead from alienation and taxation, or any reference to Paragraph 4 of Section 2 of the Act of June 28th; so if there be a repeal of that paragraph it is by implication only and repeals by implication are not favored.

"If both acts can, by any reasonable construction, be construed together, both will be sustained. Two statutes are not repugnant to each other unless they relate to the same subject. Furthermore, it is necessary to the implication of a repeal that the objects of the two statutes be the same. If they are not both statutes will stand, although they may refer to the same subject." 36 Cyc. pp. 1076, 1077.

See McCool v. Smith, 1 Black, 459, 17 L. Ed. 218; United States v. Healey, 160 U. S. 136, 16 S. Ct. 247, 40 L. Ed. 369; Cope v. Cope, 137 U. S. 682, 11 S. Ct. 222, 34 L. Ed. 832; Frost v. Wenie, 157 U. S. 46, 15 S. Ct. 532, 39 L. Ed. 614; Washington v. Miller, 235 U. S. 422, 35 S. Ct. 119, 59 L. Ed. 295.

The appellees rely upon Sections 1, 6 and 7 of the Act of April 18th, and especially the last proviso to Section 7. Before setting them out in full we give a résumé of the other sections. Section 2 permits the exchange of surplus allotments when so authorized by the Secretary of the Interior. Section 3 submits the estates of deceased allottees, orphan minors, insane and other incompetent allottees of the tribe, to the jurisdiction of the county courts of Oklahoma and authorizes a designated United States agent to inspect transactions therein in such courts and to call to the attention of the court for inves-

tigation any claimed dereliction of duty on the part of administrators or guardians of such estates or persons, and it provides

"That no land shall be sold or alienated under the provisions of this section without the approval of the Secretary of the Interior."

Section 4 declares that the rights of the Osage Tribe in oil, gas, coal and other minerals as fixed by the Act of June 28, 1906, are to be in no manner changed by the Act of April 18th. Section 5 authorizes the Secretary of the Interior, in his discretion, to pay to Osage allottees all or part of the funds in the Treasury to their individual credit. Section 8 provides that adult members of the Osage Tribe who are not mentally incompetent may dispose of their property, including that from which restrictions as to alienation have not been removed, by will, in accordance with the laws of the State of Oklahoma, but that no such will shall be valid until it has been approved by the Secretary of the Interior. Throughout these sections there is no intimation of an intention to slacken the restrictions of the prior Act as to either alienation or taxation of homesteads.

The sections relied on read thus:

Section 1: "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That until the inherited lands of the deceased members of the Osage tribe of Indians shall be partitioned or sold the Secretary of the Interior be, and he hereby is, authorized to pay the taxes on said land out of any money due and payable to the heirs from the segregated decedent's funds in the Treasury of the United States."

Obviously, there is nothing in this section that removes the restriction of the Act of June 28, 1906, exempting homesteads from alienation and taxation, or either.

Section 6: "That from and after the approval of this act the lands of deceased Osage allottees, unless the heirs agree to partition the same, may be partitioned or sold upon proper order of any court of competent jurisdiction in accordance with the laws of the State of Oklahoma: Provided, that no partition or sale of the restricted lands of a deceased Osage allottee shall be valid until approved by the Secretary of the Interior. Where some of the heirs are minors, the said court shall appoint a guardian ad litem for said minors in the matter of said partition, and partition of said land shall be valid when approved by the court and the Secretary of the Interior. When the heirs of such deceased allottees have certificates of compe-

tency or are not members of the tribe, the restrictions on alienation are hereby removed. If some of the heirs are competent and others have not certificates of competency, the proceeds of such part of the sale as the competent heirs shall be entitled to shall be paid to them without the intervention of an administrator. The shares due minor heirs, including such minor Indian heirs as may not be tribal members and those Indian heirs not having certificates of competency, shall be paid into the Treasury of the United States and placed to the credit of the Indians upon the same conditions as attach to segregated shares of the Osage national fund, or with the approval of the Secretary of the Interior paid to the duly appointed guardian. The same disposition as herein provided for with reference to the proceeds of inherited lands sold shall be made of the money in the Treasury of the United States to the credit of deceased Osage allottees."

This is a provision for partition of lands of deceased allottees by the usual court procedure, but it is to be noted there is no relaxation of governmental protective authority over the shares of those heirs who do not have certificates of competency; and in Kenny v. Miles, 250 U. S. 58, 61, 63, 39 S. Ct. 417, 418, 63 L. Ed. 841, it was said:

"The term 'restricted lands' in section 6 of the Act of 1912 means lands the alienation of which is subject to restrictions imposed by Congress to protect the Indians from their own incompetency. This is shown by a later sentence in the same section and by various provisions in the Act of 1906. * * * The Act of 1912, in its sixth section, treats the restraints applicable to living allottees as also applicable to such of the heirs of deceased allottees as are members of the tribe, and expressly provides that 'when the heirs of such deceased allottees have certificates of competency * * * the restrictions on alienation are hereby removed.' "

Section 7: "That the lands allotted to members of the Osage tribe shall not in any manner whatsoever be encumbered, taken, or sold to secure or satisfy any debt or obligation contracted or incurred prior to the issuance of a certificate of competency, or removal of restrictions on alienation; nor shall the lands or funds of Osage tribal members be subject to any claim against the same arising prior to grant of a certificate of competency. That no lands or moneys inherited from Osage allottees shall be subject to or be taken or sold to secure the payment of any indebtedness incurred by such heir prior

to the time such lands and moneys are turned over to such heirs: Provided, however, that inherited moneys shall be liable for funeral expenses and expenses of last illness of deceased Osage allottees, to be paid upon order of the County Court of Osage County, State of Oklahoma: Provided further, that nothing herein shall be construed so as to exempt any such property from liability for taxes."

■ The purpose here was (1) to protect allotted lands from sale for contractual debts incurred prior to the issuance of a certificate of competency, or removal of restrictions on alienation; (2) to protect allotted lands and funds of non-competent tribal members from all claims, contractual or non-contractual, "nor shall the lands or funds of Osage tribal members be subject to any claim against the same arising prior to grant of a certificate of competency"; and (3) to protect the lands and moneys of heirs from their debts contracted prior to their receiving same. Obviously, the secondly stated purpose was so broad in its terms, if taken literally, it might be construed to exempt from taxation lands then taxable, for taxes are in a broad sense a claim for which lands may be taken; hence the second proviso. The office of a proviso, speaking in general, is,—to make exceptions from the enacting clause, to exclude some possible ground of misinterpretation, to restrain generalities and to make clear that which has gone before. Minis v. United States, 15 Pet. 423, 10 L. Ed. 791; Selma R. & D. R. Co. v. United States, 139 U. S. 560, 11 S. Ct. 638, 35 L. Ed. 266; White v. United States, 191 U. S. 545, 24 S. Ct. 171, 48 L. Ed. 295; Quackenbush v. United States, 177 U. S. 20, 20 S. Ct. 530, 44 L. Ed. 654; American Express Co. v. United States, 212 U. S. 522, 29 S. Ct. 315, 53 L. Ed. 635; United States v. Morrow, 266 U. S. 531, 45 S. Ct. 173, 69 L. Ed. 425; Continental Ins. Co. v. Simpson (C. C. A.) 8 F.(2d) 439; Snitkin v. United States (C. C. A.) 265 F. 489. And so, considering the proviso in its generally accepted function, it is an appropriate limitation on the sentence quoted supra. Without the proviso there would have been some ground to contend that the section had exempted surplus lands of non-competents from taxation. But the Supreme Court of Oklahoma had this question under consideration in Hudson v. Hopkins, 75 Okl. 260, 183 P. 507, page 510, and of this proviso it said:

"In our judgment the only construction that could be given to this proviso would be that the same was intended as an independent provision and enactment, withdrawing the exemption that existed in favor of the homestead allotment of a deceased Indian, and making the same taxable, the same as surplus lands."

■ A proviso may be used, not in accord with its technical meaning, but independently of what precedes it, to introduce new matter. United States v. Babbit, 1 Black, 55, 17 L. Ed. 94; Interstate Commerce Commission v. Baird, 194 U. S. 25, 24 S. Ct. 563, 48 L. Ed. 860. We cannot see that this proviso, so considered, can serve that purpose. It indicates no intention to remove existing exemptions, but rather to retain them. However, if there be doubt on the subject it is removed, we think, by discussions of the Act when it was under consideration in the House, and to which we may look to ascertain its meaning. Work v. Braffet, 276 U. S. 560, 48 S. Ct. 363, 365, 72 L. Ed. 700; United States v. Mo. Pac. R. R. Co., 278 U. S. 269, 49 S. Ct. 133, 136, 73 L. Ed. 322. In the Work Case it was said: "That such was the purpose [of a section of an Act] is established by the Congressional debates;" and in the Missouri Pacific Case the court said: "Where doubts exist and construction is permissible, reports of the Committees of Congress and statements by those in charge of the measure, and other like extraneous matter, may be taken into consideration to aid in the ascertainment of the true legislative intent." As shown in appellant's brief, not controverted, it appears from Congressional Record, p. 4243 et seq. 62d Congress, that Mr. McGuire was in charge of the bill when discussion arose. Several members asked to be informed whether the bill proposed any changes as to taxation.

"Mr. Mann: I understand the House amendment does not propose to subject to taxation the lands of the Indians farther than they are now subject to taxation.

"Mr. McGuire of Oklahoma: Well, the Senate bill provides the lands may become taxable after the certificate of competency is issued, and I inserted the word 'only.'

"Mr. Ferris: This bill does not make any change in the law with reference to taxation.

"Mr. McGuire: It does not. It does not extend the power of the Indians or restrict the power of the Indians but simply takes greater precaution.

"Mr. Burke of South Dakota: I would like to suggest to the gentleman from Oklahoma (Mr. Ferris) that I think the intention of the Committee on Indian Affairs was not to change existing law, either by direction or otherwise, that would enlarge the power to tax any of these lands that were not now taxed."

We presume the Supreme Court of Oklahoma did not have the benefit of this discussion when it delivered the opinion in the Hopkins Case.

Appellees also rely on Section 3 of the Act of March 3, 1921 (41 Stat. 1250), particularly the last sentence of that section. The whole section reads thus:

"That all members of the Osage tribe of Indians are hereby declared to be citizens of the United States, but this shall not affect their interest in tribal property or the control of the United States over such property as is now or may hereafter be provided by law, and all restrictions against alienation of their allotment selections, both surplus and homestead, of all adult Osage Indians of less than one-half Indian blood, are hereby removed, and the Secretary of the Interior shall, within four months after the passage of this act, determine what members of said tribe are of less than one-half Indian blood, and their ages, and his determination thereof shall be final and conclusive. The homestead allotments of the members of the Osage tribe shall not be subject to taxation if held by the original allottee prior to April 8, 1931."

No other part of that Act has any relation to the taxation of homestead allotments. It is entitled an Act to amend Section 3 of the Act of June 28, 1906, which reserved to the Osage Tribe for a period of 25 years from and after April 8, 1906, all the oil, gas, coal and other mineral under the allotted lands. All of the Act of 1921 relates to that subject, except its third section. It is observed that the section puts all Osage Indians having less than one-half Indian blood in a class by themselves as to competency to manage their affairs, and as to them removes all restrictions against alienation of their allotments, both homestead and surplus lands. Nothing is said in that respect of those who have half or more Indian blood and to whom certificates of competency have not issued. Clearly, as to them restrictions against alienation were not removed; but counsel for appellees argue that the last sentence of the section removed exemption from taxation of all homesteads, saving only those that might be held by the allottee, regardless of his degree of Indian blood, or his competency or incompetency. This would have been an unusual thing to do, and contrary to precedent. The homesteads of Cherokees and Creeks were made alienable but non-taxable. Choate v. Trapp, 224 U. S. 665, 32 S. Ct.

565, 56 L. Ed. 941. Moreover, the manner of expressing that purpose is not apt in view of the exemption from taxation of all homesteads given by the Act of June 28, 1906. The section does not in terms remove exemption of homesteads of all allottees. The whole subject matter of the earlier Act in this respect is not covered by this section, therefore it cannot be taken as a substitute for paragraphs 4 and 7 of section 2 of the Act of 1906, and both statutes must stand and be brought into reconciliation. United States v. Claflin, 97 U. S. 546, 24 L. Ed. 1082, and cases supra on repeals by implication. The purpose of Congress seems plain, and it is reasonable, practicable and in keeping with prior acts which dealt with the subject. Under the rule announced in Goudy v. Meath, 203 U. S. 147, 27 S. Ct. 48, 51 L. Ed. 130, homestead allotments of adult Osages having less than half Indian blood became immediately taxable on removal of restrictions against alienation. This the section did, and its last sentence is a saving clause in their interest, under the conditions named. It continued the exemption of homesteads from taxation of allottees having less than half Indian blood until April, 1931, in cases where the homestead was held by the original allottee, otherwise they would have been taxable on approval of the Act. It has no relation to the alienation and taxation of homesteads of allottees having half or more Indian blood.

In Cause No. 8439 the action is against Hunter as county treasurer of Osage county, to recover taxes assessed for several years on an Osage homestead allotment after the death of the allottee and paid under protest. There was no sale of the land as in the other case, but otherwise the facts in the two cases are alike. The allottee died intestate in March, 1919, leaving a husband and daughter as her sole and only heirs. She and they were restricted Osages of half or more Indian blood and a certificate of competency was never issued to her or to either of her heirs. A demurrer to the complaint in this case was also sustained. The same issues of law are in both, appellee relying on the statutes considered in the other case to sustain the ruling below.

For reasons stated in our discussion of the points in the Mullendore Case the order of dismissal in each case is reversed with directions to vacate them and overrule the demurrers.